PACE, the Suburban Bus Division of the Regional Transportation Authority, Plaintiff-Appellant, v. THE REGIONAL TRANSPORTATION AUTHORITY, Defendant-Appellee.

Second District No. 2—02—0651

Opinion filed July 17, 2003.

David W. McArdle, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, and Ellen L. Champagne, of PACE, of Arlington Heights, for appellant.

William I. Caldwell, Jr., of Caldwell, Berner & Caldwell, of Woodstock, and Hugh R. McCombs, Julian C. D'Esposito, Jr., and Jeffrey W. Sarles, all of Mayer, Brown, Rowe & Maw, of Chicago, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

## I. INTRODUCTION

Plaintiff, Pace, the suburban bus division of the Regional Transportation Authority (Pace), sought a declaration that defendant, the Regional Transportation Authority (RTA), violated section 4.11 of the Regional Transportation Authority Act (Act) (70 ILCS 3615/4.11 (West 2000)) when it decreased Pace's operating subsidy and rejected its budget for 2002. Also, Pace sought "damages" in the form of subsidies that the RTA allegedly wrongfully denied it. The trial court granted the RTA's motion to dismiss. The court found that the decisions Pace challenges were discretionary acts not subject to judicial review. Also, the court found that Pace was a division of the RTA and therefore could not sue the RTA. We reverse and remand.

## II. BACKGROUND

Before setting forth the background of the dispute in this cause, we provide an overview of the relationship between the RTA and Pace. The legislature passed the Act in 1974. The Act created the RTA, which voters in Cook, Du Page, Kane, Lake, McHenry, and Will Counties approved by referendum. See *Stroger v. Regional Transportation Authority*, 201 Ill. 2d 508, 512 (2002). The purpose of the RTA is to oversee public transportation in the six-county region. 70 ILCS 3615/ 1.02(a)(v) (West 2000). The RTA is a "unit of local government, body politic, political subdivision and municipal corporation." 70 ILCS 3615/1.04 (West 2000).

In 1983, the legislature amended the Act to create the commuter rail division (Metra) (70 ILCS 3615/3B.01 (West 2000)) and Pace (70 ILCS 3615/3A.01 (West 2000)). The 1983 amendments designated as "service boards" the governing boards of Metra and Pace. See 70 ILCS 3615/1.03 (West 2000). The Act also designated as a service board the governing board of the Chicago Transit Authority (CTA), which has existed since 1945 (see 70 ILCS 3605/1 *et seq.* (West 2000)). The Act delegated to the three service boards the responsibility for providing and operating their respective transportation systems. 70 ILCS 3615/2.01(a) (West 2000). The RTA retained responsibility for the financial oversight of the system and for facilitating the service boards' efforts to deliver public transportation in the region. 70 ILCS 3615/1.02(c) (West 2000).

The RTA board is comprised of 13 directors, and the regions of the six-county area are represented as follows: four directors must reside in Chicago; four directors must reside in suburban Cook County; two directors must reside either in Kane, Lake, McHenry, or Will County; and one director must reside in Du Page County. 70 ILCS 3615/3.01(a) through (d) (West 2000). The chairperson may reside anywhere in the six-county area (70 ILCS 3615/3.01(e) (West 2000)), and one director, who also is the chairperson of the CTA, must reside in the "Metropolitan area of Cook County" (70 ILCS 3605/2, 19; 3615/3.01(a) (West 2000)). The RTA board reviews and decides whether to approve the service boards' budgets. Nine directors must vote to approve a service board's budget. 70 ILCS 3615/4.11(b)(4) (West 2000). Pace has a governing board consisting of 11 directors, who must be chief executive officers of municipalities within Pace's territory, and a chairperson. 70 ILCS 3615/3A.02 (West 2000).

The RTA and the service boards are financed by a combination of fare box revenue, sales tax proceeds, and state and federal grant funds. The Act mandates that the service boards' aggregate operating revenue equal at least 50% of their aggregate cost of providing public

transportation each fiscal year. 70 ILCS 3615/4.01(b) (West 2000). If the 50% ratio is not met, the RTA does not receive its annual subsidy from the state and must reduce the service boards' funding accordingly. 70 ILCS 3615/4.09(g), (h) (West 2000). To accomplish the mandate, the RTA sets for each service board a recovery ratio, which represents the percentage of the service board's operating costs that must be recovered by that service board's "system generated revenues." 70 ILCS 3615/4.11(a) (West 2000).

In count I of its complaint, dated January 11, 2002, Pace alleged that, in violation of section 4.11(a) of the Act, the RTA "disproportionately and prejudicially" increased Pace's recovery ratio. From 1985 to 2002, the RTA increased the recovery ratios for the CTA, Metra, and Pace by 2.8%, 6.14%, and 41.7%, respectively. From 1996 to 2002, the CTA's assigned recovery ratio decreased from 52.4% to 52%, Metra's recovery ratio increased from 55% to 55.3%, and Pace's recovery ratio increased from 36% to 40%.

Pace alleged further that the ratios were disproportionate when one considered the service boards' actual performance. For example, the CTA's budgeted recovery ratio for 2000 was 0.8% less than what the CTA actually recovered in 1999 and only 0.2% higher than the 1999 budgeted ratio; Metra's 2000 assigned ratio was 3.8% less than what Metra recovered in 1999 and the same as the 1999 budgeted ratio; and Pace's 2000 budgeted ratio was 7.8% more than what Pace actually recovered in 1999 and 9% more than the 1999 budgeted ratio.

In 2000, Pace did not achieve its 40% ratio. Nevertheless, the RTA again set Pace's 2001 ratio at 40%. To meet the budgeted ratio, Pace raised fares and reduced its staff, marketing expenditures, and services. As a result, Pace's ridership declined by 1,468,326 passenger trips in 2000 and another 1,652,036 passenger trips in 2001.

Pace alleged that, as a result of the RTA's violations of the Act, since 1996, Pace "has been damaged and injured in its corporate capacity through loss of funding in the amount of $99,755,000." Pace asked the court to (1) declare that, for the years 1996 through 2002, the RTA set recovery ratios for Pace that were disproportionate to the ratios set for the other service boards and prejudicial to Pace; (2) order the RTA to set Pace's 2002 recovery ratio at a level that is proportionate to the other service boards' ratios and not prejudicial to Pace; and (3) award Pace $99,755,000 in "damages."

In count II, Pace alleged that, to meet its recovery ratio without cutting services or raising fares further, it sought other funding sources, including federal grants. Each year, the RTA advises the service boards of the amount of federal funding available to them. Since 1985, the RTA consistently allocated 58% of the available funds

to the CTA, 34% to Metra, and 8% to Pace. In September 2001, the RTA allocated $25.9 million in federal funds to Pace. Of this amount, $7.6 million was designated for the "capital cost of contracting." This figure represented 8% of all of the federal funds allocated to the service boards.

Pace's 2002 budget allocated $7.8 million of the federal funds to the "capital cost of contracting," which, according to Pace, was the expense of purchasing services from private carriers. Pace alleged that federal regulations allowed it to use the federal funds for this purpose. The Pace board approved the budget and forwarded it to the RTA. Pace alleged that its budget complied with the Act and, therefore, that, under section 4.11(b)(2) of the Act, the RTA was required to approve the budget.

In ordinance No. 2001—83, dated December 28, 2001, the RTA rejected Pace's 2002 budget because it used "federal capital funds" to cover operating expenses. The RTA concluded that, by doing so, the budget relied on unreasonable and imprudent assumptions and did not comply with sound financial practices. The RTA approved an amended budget which removed the grant funds line item and compensated for the removal of those funds by reducing various expenses.

Pace alleged that the RTA violated section 4.11(b)(2) by rejecting Pace's 2002 budget and arbitrarily and capriciously approving an amended budget. Pace asked the court to declare that the RTA's rejection of Pace's 2002 budget was invalid.

The RTA moved to dismiss pursuant to sections 2—615 and 2—619 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615, 2—619 (West 2000)). See 735 ILCS 5/2—619.1 (West 2000). It argued that (1) separation of powers principles precluded the court from reviewing the RTA's discretionary budget decisions; (2) as an operating division of the RTA, Pace lacked the capacity to sue the RTA; (3) the RTA was entitled to protection under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 et seq. (West 2000)); (4) the Act does not provide a private right of action to parties aggrieved by violations of the Act; and (5) Pace's claims were time barred, both under the statute of limitations contained in the Tort Immunity Act (745 ILCS 10/8—101 (West 2000)) and the laches doctrine.

The trial court found that, as a division of the RTA, Pace did not have the capacity to sue the RTA. Also, the trial court found that setting recovery ratios and approving or rejecting budgets were discretionary acts not subject to judicial review. Accordingly, the court granted the motion to dismiss. Pace timely appealed.

# III. ANALYSIS

## A. Mootness

Before we address the merits of this appeal, we must decide whether we should dismiss the appeal as moot. Pace complains about decisions the RTA made for the 2002 budget year, which has passed. See 70 ILCS 3615/4.01(a) (West 2000) (RTA's fiscal year runs from January 1 to December 31).

■ Before the oral argument took place, we raised the mootness issue *sua sponte*. In response, each party has moved to submit supplemental materials. The RTA seeks to submit recent ordinances it has adopted. On December 13, 2002, the RTA adopted ordinance No. 2002—83, which approved the service boards' 2003 budgets. Again, because Pace proposed using capital grants to fund operating costs, the RTA found that Pace's budget did not employ reasonable and prudent projections and was not financially sound. The RTA approved Pace's budget with the caveat that, to the extent Pace's budget and the ordinance conflicted, the ordinance prevailed. On May 1, 2003, the RTA adopted ordinance No. 2003—23, which approved Pace's use of some of the disputed grant funds. Pace seeks to submit a consultant's report on the uses and benefits of the grant funds.

These materials concern events that occurred after the trial court's ruling. We may take judicial notice of the RTA's ordinances, however. 735 ILCS 5/8—1001, 8—1002 (West 2002); *Chicago Limousine Service, Inc. v. City of Chicago*, 335 Ill. App. 3d 489, 492 (2002). Likewise, the consulting report is a public document, and we may take judicial notice of it. *Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill. App. 3d 935, 938 (1998). The RTA has not objected to Pace's motion, and, in deciding whether a claim is moot, we may consider matters *dehors* the record. *Oak Grove Jubilee Center, Inc. v. City of Genoa*, 338 Ill. App. 3d 967, 972 (2003). Accordingly, we allow both motions. We note, however, that we consider these materials only in connection with the mootness issue.

■ Courts of review generally will not consider moot or abstract questions or render advisory opinions. *In re Mary Ann P.*, 202 Ill. 2d 393, 401 (2002). A case is moot when the resolution of a question of law cannot affect the result of the case or when events have occurred that make it impossible for the reviewing court to render effectual relief. *Marion Hospital Corp. v. Illinois Health Facilities Planning Board*, 201 Ill. 2d 465, 471 (2002). A case on appeal is rendered moot where the issues that were presented in the trial court do not exist any longer because intervening events have rendered it impossible for the reviewing court to grant the complaining party relief. *In re India B.*, 202 Ill. 2d 522, 542 (2002).

Courts have declined to address budgetary issues where the budget year in question had already passed. *People ex rel. Sklodowski v. State*, 162 Ill. 2d 117, 133-34 (1994) (whether transfer of monies from state pension fund to general revenue fund during the 1992 fiscal year should have been temporarily enjoined was rendered moot by actual transfer of funds); *West Side Organization Health Services Corp. v. Thompson*, 79 Ill. 2d 503, 506-08 (1980) (*mandamus* action to compel governor and other state officials to expend unused portion of appropriation was moot where funds were no longer available because appropriation had lapsed pursuant to statute); *Illinois News Broadcasters Ass'n v. City of Springfield*, 22 Ill. App. 3d 226, 228 (1974) (whether city's human rights commission properly held closed meeting was moot where meeting addressed dismissal of executive director, who had long since been discharged, and salary changes for previous fiscal year); *Hill v. Murphy*, 14 Ill. App. 3d 668, 671 (1973) (whether police board's budget meeting for 1972 fiscal year was required to be open to public was moot where budget had been approved and mostly spent).

■ There are two well-recognized exceptions to the mootness doctrine. These exceptions must be construed narrowly and require a clear showing of each criterion necessary to bring the case within their terms. *In re India B.*, 202 Ill. 2d at 543. One provides that a reviewing court has the power to decide technically moot issues if they are capable of repetition yet evade review. *Mount Carmel High School v. Illinois High School Ass'n*, 279 Ill. App. 3d 122, 125 (1996). For this exception to apply, there must be a reasonable expectation that the same complaining party would be subject to the same action again, and the duration of the challenged action must be too short to be fully litigated before its cessation. *In re India B.*, 202 Ill. 2d at 543. Both elements of this exception are present here. First, there is a reasonable probability that Pace will again be subject to similar adverse budget decisions. In its complaint, Pace alleges that the adverse treatment has continued over several years. The supplemental materials that the RTA submitted show that Pace's recovery ratio continues to be 40% and that the parties still dispute how Pace may use the federal grant funds. Second, the apparently continuing controversy here will always be limited to a single budget year, and there is little question that these potentially complicated financial issues cannot be *fully* litigated before at least the bulk of the budget year has passed.

The second exception, the public interest exception, also applies here. When deciding whether to apply this exception, a court considers (1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will recur. *In re Mary Ann P.,*

202 Ill. 2d at 402. Whether a service board may seek judicial review of the RTA's budget decisions is a matter of substantial public concern affecting public transportation in the region. Moreover, because future budget disputes are likely, a decision on the issue will be beneficial to guide the RTA board and the service boards. This is one of the "rare" cases that should be reviewed because of the magnitude of the interests involved and because the dispute is likely to recur but is unlikely to last long enough to allow appellate review. *Prairie Rivers Network v. Illinois Pollution Control Board*, 335 Ill. App. 3d 391, 408 (2002).

The RTA relies primarily on *West Side Organization*, which is distinguishable. The plaintiffs in that case brought a *mandamus* action to compel officials of the state's executive branch to expend funds the General Assembly appropriated for the use of the Dangerous Drugs Commission. The court held that, because the appropriation had lapsed while the appeal was pending, the funds were no longer available. Therefore, the appeal was moot. *West Side Organization*, 79 Ill. 2d at 508. Here, Pace seeks primarily declaratory relief, not a writ of *mandamus* compelling the release of funds. Although the 2002 budget year has passed, any relief Pace might obtain in this case could potentially affect future budgets. In count I, Pace essentially seeks a lower recovery ratio that could affect its recovery ratios in subsequent years. In count II, Pace seeks general authorization to use federal grant funds to offset the "capital cost of contracting." Also, we note that the court in *West Side Organization* did not discuss any of the exceptions to the mootness doctrine. For these reasons, we will review the merits of the appeal.

## B. Standard of Review

The RTA brought a combined motion to dismiss, relying on sections 2—615 and 2—619 of the Code. See 735 ILCS 5/2—619.1 (West 2000). A motion to dismiss under section 2—615 of the Code tests the legal sufficiency of a pleading. *Universal Scrap Metals, Inc. v. J. Sandman & Sons, Inc.*, 337 Ill. App. 3d 501, 504 (2003). The court accepts as true all well-pleaded facts and the inferences that can reasonably be drawn from those facts. *Universal Scrap Metals*, 337 Ill. App. 3d at 504. The issue is whether, when viewed in the light most favorable to the plaintiff, the allegations are sufficient to state a cause upon which relief can be granted. *Universal Scrap Metals*, 337 Ill. App. 3d at 504.

A section 2—619 motion to dismiss admits the legal sufficiency of the complaint and raises defects, defenses, or other matters that act to defeat the claim. *Krilich v. American National Bank & Trust Co. of Chicago*, 334 Ill. App. 3d 563, 569-70 (2002). When ruling on a section 2—619 motion, the trial court may consider the pleadings, depositions,

and affidavits. *Krilich*, 334 Ill. App. 3d at 570. The issue on appeal is whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether the dismissal is proper as a matter of law. *Krilich*, 334 Ill. App. 3d at 570. We review *de novo* the trial court's decision to grant a section 2—619.1 combined motion to dismiss. *Lawson v. City of Chicago*, 278 Ill. App. 3d 628, 634 (1996).

## C. Separation of Powers

One basis for the trial court's decision was that Pace was challenging a local government's discretionary acts that are not subject to judicial review. The RTA argues that "[w]hen a municipal body acts legislatively, its decision is subject only to review for arbitrariness as a matter of substantive due process." *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 187 (2002). Thus, according to the RTA, under this standard, only a due process claim would be available to Pace. Because Pace is a governmental entity, however, it does not possess any due process rights. See *City of Evanston v. Regional Transportation Authority*, 202 Ill. App. 3d 265, 275-78 (1990) (as political subdivisions of the state, RTA and Pace do not possess substantive due process and equal protection rights under federal and state constitutions).

■ The RTA's reliance on *Klaeren* is misplaced. When the part of the *Klaeren* decision quoted above is considered in its appropriate context, it is clear that the standard in *Klaeren* does not apply here. *Klaeren* discussed the standards for reviewing a municipality's ruling on a special use permit. Municipalities act in administrative or quasi-judicial capacities when they conduct zoning hearings on special use permits. *Klaeren*, 202 Ill. App. 3d at 183. When a legislative body acts administratively, its decision is subject to general principles of administrative review. *City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill. 2d 1, 13 (2001).

The problem with the RTA's reliance on *Klaeren* is that *Klaeren* addressed only the standard of review dichotomy in zoning cases and therefore did not fully discuss the principles that are relevant to this appeal. The appropriate standards are as follows. We are mindful that the courts cannot review matters that are in effect attempts to overrule the decisions of a municipality's legislative body based upon an alleged failure to follow requirements imposed by that body itself. *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 592 (1999). The courts have the authority to invalidate legislation adopted by a municipality only if the enactment violates the federal or state constitution or the mandate of a federal or state statute. *City of Elgin v. County of Cook*, 169 Ill. 2d 53, 63 (1995).

■ Here, Pace alleged that, when the RTA raised Pace's recovery ratio and rejected Pace's budget, it violated the mandates of sections 4.11(a) and 4.11(b) of the Act. See *Woolfolk v. Board of Fire & Police Commissioners*, 79 Ill. App. 3d 27, 31 (1979) (recognizing that an ordinance may be reviewable in a declaratory judgment action if plaintiff alleges that ordinance is unlawful). Pace alleges that the RTA violated the Act, not that Pace's constitutional rights have been violated.

The RTA relies on several decisions it claims stand for the general proposition that a legislative body's budgetary decisions are purely discretionary matters that are not subject to judicial review. According to the RTA, "[t]he judiciary should not attempt to review budgetary decisions when made by the branch of government having the authority to control spending." *West Side Organization Health Services Corp. v. Thompson*, 73 Ill. App. 3d 179, 187 (1979), *rev'd on other grounds*, 79 Ill. 2d 503 (1980); see also *American Federation of State, County, & Municipal Employees v. Ryan*, 332 Ill. App. 3d 965, 968 (2002). This certainly is true. The RTA ignores, however, the appellate court's subsequent statement in *West Side Organization* that "[i]f the officials of the executive branch have exceeded the limits of their authority, thereby acting unlawfully, the courts will not hesitate to say so." *West Side Organization*, 73 Ill. App. 3d at 187; see also *Woolfolk*, 79 Ill. App. 3d at 30-31 (although court recognized that ordinance abolishing police force was legislative act not subject to administrative review, court reviewed municipality's actions to determine if they were unlawful). Pace is not asking the courts to pass on the wisdom of the RTA's budget decisions but instead claims that those decisions were unlawful. Therefore, we conclude that separation of powers principles do not prevent Pace's claims from going forward.

### D. Statutory Right of Action

The question then becomes whether the Act contemplates judicial review of the RTA's budget decisions. The Act does not specifically provide for judicial review of any of the RTA's decisions. Although the RTA is a municipal corporation and not an administrative agency, decisions addressing the reviewability of agency decisions under statutory schemes that do not adopt the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2000)) are helpful here.

■ Whether and to what extent a court may review an administrative agency's action is a question of statutory interpretation. *Hanrahan v. Williams*, 174 Ill. 2d 268, 273 (1996). Although most agency actions are presumed reviewable, no presumption arises if there is a statutory bar to review or the statutory language commits the agency's

decision to unreviewable discretion. *Hanrahan*, 174 Ill. 2d at 273. Factors to consider are the statute's language, structure, objectives, and legislative history and the nature of the administrative action at issue. *Hanrahan*, 174 Ill. 2d at 273. Particularly important is whether the statute contains standards, goals, or criteria by which a court may evaluate the action. *Hanrahan*, 174 Ill. 2d at 273-74. Judicial review is precluded if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. *Hanrahan*, 174 Ill. 2d at 273-74.

Two decisions provide direct guidance here. In *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462 (1988), neighboring residents sued to stop a proposed rehabilitation development project. Apartments in the project were to be made available only to very-low-income tenants. The plaintiffs alleged that the decision of the Illinois Housing Development Authority (IHDA) to finance the project violated a statute stating that the income limits "shall be sufficiently flexible to avoid undue economic homogeneity" among the tenants of a development. See 20 ILCS 3805/10 (West 2000).

The governing statute did not expressly provide for judicial review of the IHDA's decision to finance a project. Nevertheless, the court held that such a decision was reviewable. The court noted that, if the IHDA had absolute discretion to determine the number of units to be made available to low-income tenants, then the mandate quoted above would have no meaning. *Greer*, 122 Ill. 2d at 499. Also, the terms "flexible" and "undue economic homogeneity" were not so vague or general so as to preclude judicial review. *Greer*, 122 Ill. 2d at 500. According to the court, the "IHDA's decision as to what constitutes 'undue' homogeneity is obviously entitled to great deference. But this deference is best assured by subjecting that decision only to review to determine whether it is arbitrary or capricious, and not by insulating it from judicial review altogether." *Greer*, 122 Ill. 2d at 501. Finally, the court rejected the IHDA's contention that its status as a "body corporate and politic," rather than as an agency that makes adjudicatory decisions, precluded judicial review. *Greer*, 122 Ill. 2d at 501-04.

In *City of East St. Louis v. East St. Louis Financial Advisory Authority*, 188 Ill. 2d 474 (1999), the City of East St. Louis (City) designated itself a financially distressed city. Under the Financially Distressed City Law (65 ILCS 5/8—12—1 *et seq.* (West 2000)), the City was required to submit its annual budget to a financial advisory authority (authority) for approval. After the authority rejected two of the City's proposed budgets for 1998, the City sued.

The governing statute did not expressly provide for judicial review of the authority's decisions. It provided:

"The Authority shall approve each Budget if, in its judgment, the Budget is complete with respect to providing a detailed accounting of revenues and expenditures, is reasonably capable of being achieved, will meet the requirement [of being balanced], and will be consistent with the Financial Plan in effect. Otherwise, the Authority shall reject the Budget. The Authority's review of the Budget shall be in accordance with generally accepted accounting principles and standards. No Budget submitted by the financially distressed city shall be arbitrarily or capriciously rejected by the Authority." 65 ILCS 5/8—12—16(3) (West 2000).

Whether the authority's decision to reject a budget was subject to judicial review apparently was not a contested issue in the case. Citing *Greer*, the court reviewed whether the authority acted arbitrarily and capriciously when it rejected the City's proposed budgets. *East St. Louis*, 188 Ill. 2d at 487-89.

*Greer* and *East St. Louis* support a conclusion that the budgetary decisions Pace challenges here are reviewable. In count I, Pace alleged that the RTA violated section 4.11(a) of the Act, which provides:

"In determining a Service Board's system generated revenue recovery ratio, the [RTA] Board shall consider the historical system generated revenues recovery ratio for the services subject to the jurisdiction of that Service Board. The Board shall not increase a Service Board's system generated revenues recovery ratio for the next fiscal year over such ratio for the current fiscal year disproportionately or prejudicially to increases in such ratios for other Service Boards." 70 ILCS 3615/4.11(a) (West 2000).

Like the statute at issue in *Greer*, section 4.11(a) provides a mandate and a standard to guide the review of the RTA's decision. The phrase "disproportionately or prejudicially" is not any more vague or general than the phrase "undue economic homogeneity."

In count II, Pace alleged that the RTA violated section 4.11(b)(2) by rejecting Pace's 2002 budget and arbitrarily and capriciously approving an amended budget. Section 4.11(b) provides in pertinent part:

"(1) Not later than the next preceding November 15 prior to the commencement of such fiscal year, each Service Board shall submit to the Authority its proposed budget for such fiscal year and its proposed financial plan for the two following fiscal years. Such budget and financial plan shall not project or assume a receipt of revenues from the Authority in amounts greater than those set forth in the estimates provided by the Authority pursuant to subsection (a) of this Section.

(2) The Board shall review the proposed budget and financial plan submitted by each Service Board, and shall adopt a consoli-

dated budget and financial plan. The Board shall approve the budget and plan if:

(i) the Board has approved the proposed budget and cash flow plan for such fiscal year of each Service Board, pursuant to the conditions set forth in clauses (ii) through (vii) of this paragraph;

(ii) such budget and plan show a balance between (A) anticipated revenues from all sources including operating subsidies and (B) the costs of providing the services specified and of funding any operating deficits or encumbrances incurred in prior periods, including provision for payment when due of principal and interest on outstanding indebtedness;

(iii) such budget and plan show cash balances including the proceeds of any anticipated cash flow borrowing sufficient to pay with reasonable promptness all costs and expenses as incurred;

(iv) such budget and plan provide for a level of fares or charges and operating or administrative costs for the public transportation provided by or subject to the jurisdiction of such Service Board sufficient to allow the Service Board to meet its required system generated revenue recovery ratio;

(v) such budget and plan are based upon and employ assumptions and projections which are reasonable and prudent;

(vi) such budget and plan have been prepared in accordance with sound financial practices as determined by the Board; and

(vii) such budget and plan meet such other financial, budgetary, or fiscal requirements that the Board may by rule or regulation establish." 70 ILCS 3615/4.11(b) (West 2000).

Section 4.11(b)(2) is similar to the statute in *East St. Louis* because it states that the RTA "shall" approve a service board's budget if it satisfies the listed criteria. Section 4.11(b)(2) is different from the statute in *East St. Louis*, however, because it does not contain the "arbitrary and capricious" language. Nevertheless, section 4.11(b)(2) provides sufficient standards to guide courts, and, under *Greer*, the "arbitrary and capricious" standard would apply in any event.

The RTA relies on *Hanrahan*, which is distinguishable. There, a prison inmate sued the Prisoner Review Board (parole board) to obtain review of the parole board's decision to deny him parole. The relevant statute required the parole board to consider certain evidence and stated that the parole board shall not parole a prisoner if certain criteria are satisfied. The statute did not provide any criteria that, if satisfied, would require the parole board to grant parole. *Hanrahan*, 174 Ill. 2d at 274-75. The court concluded that the statutory criteria did not provide standards for release on parole that were sufficiently objective to allow a court to evaluate a decision to deny parole. Accordingly, the court held that the legislature intended the parole board to

have complete discretion in determining whether to grant parole in situations where the statute does not mandate that parole be denied. *Hanrahan*, 174 Ill. 2d at 274-75.

■ Unlike the statute in *Hanrahan*, the statute here provides mandates and standards to guide the courts. Although sections 4.11(b)(2)(vi) and 4.11(b)(2)(vii) grant the RTA the discretion to establish financial requirements for budgets, there is no indication that the legislature intended the RTA to have complete discretion in deciding whether to approve a service board's budget. As was the case in *Greer*, if the RTA had complete discretion over the budgetary decisions Pace challenges here, then the mandates in section 4.11 of the Act would have no meaning.

The RTA argues that, because sections 4.11(a) and 4.11(b) do not specify what result will follow if the RTA fails to comply with their terms, the use of "shall" in those sections is merely directory and not mandatory. When used in a statute, the term "shall" is generally interpreted to mean that something is mandatory. *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 598 (2000). The term does not have a fixed or inflexible meaning, however, and may be given a permissive interpretation depending on the legislative intent. *Courtney v. County Officers Electoral Board*, 314 Ill. App. 3d 870, 873 (2000). If the provision merely directs a manner of conduct to guide officials or is designed to secure order, system, and dispatch in proceedings, it is generally directory. *Johnson v. Theis*, 282 Ill. App. 3d 966, 972 (1996). A court will not give "shall" a permissive meaning, however, where it is used with reference to any right or benefit to anyone and the right or benefit depends on giving a mandatory meaning to the term. *Armstrong v. Hedlund Corp.*, 316 Ill. App. 3d 1097, 1106 (2000).

Sections 4.11(a) and 4.11(b) do not merely prescribe a manner of conduct to guide officials, and Pace's complaint does not allege merely minor and technical violations of the Act that did not affect the overall fairness of the budget process. See *Cole v. Department of Public Health*, 329 Ill. App. 3d 261, 265 (2002). Instead, Pace's complaint and sections 4.11(a) and 4.11(b) address important substantive concerns. The budgetary requirements contained in the Act reflect the legislature's concern over the need to balance the varying interests of the diverse region that the RTA serves. See *Stroger*, 201 Ill. 2d at 523. Thus, ensuring fairness in the budgeting process is one of the Act's primary functions. Moreover, we note that the *Greer* court interpreted the statute at issue there as mandatory even though the statute did not specify any consequences for the failure to comply with its terms. *Greer*, 122 Ill. 2d at 499.

For these reasons, we conclude that the Act contemplates judicial review of the budgetary decisions at issue here. As was the case in *Greer*, the RTA's decisions here are entitled to great deference. But this deference is best assured by subjecting those decisions only to review to determine whether they are arbitrary or capricious, and not by insulating them from judicial review altogether.

### E. Pace's Capacity to Sue RTA

■ The RTA argues that Pace is merely one of its operating divisions and therefore lacks the capacity to sue it. According to the RTA, in this cause, the RTA is essentially suing itself. The trial court agreed. Certain language in the Act lends support to this contention, but further review of the Act reveals that the RTA's argument is not well taken. Of course, our primary goal here is to give effect to the legislature's intent. *Stroger*, 201 Ill. 2d at 524. The best evidence of legislative intent is the statute's language, which must be given its plain and ordinary meaning. *Stroger*, 201 Ill. 2d at 524.

When the legislature amended the Act in 1983, it found that, although the RTA should continue to exist, it was necessary to modify the RTA's powers and responsibilities and to reallocate responsibility for operating decisions. 70 ILCS 3615/1.02(b)(iii) (West 2000). The legislature further declared:

"It is the purpose of this Act to provide for, aid and assist public transportation in the northeastern area of the State without impairing the overall quality of existing public transportation by providing for the creation of a single authority responsive to the people and elected officials of the area and with the power and competence to provide financial review of the providers of public transportation in the metropolitan region and facilitate public transportation provided by Service Boards which is attractive and economical to users, comprehensive, coordinated among its various elements, economical, safe, efficient and coordinated with area and State plans." 70 ILCS 3615/1.02(c) (West 2000).

Consistent with the idea of a "single authority," the Act provides that "[t]here is established within the [RTA] the Suburban Bus Division as the operating division responsible for providing public transportation by bus and as may be provided in this Act." 70 ILCS 3615/3A.01 (West 2000). Although the Act designates Pace as an operating division of the RTA, it is difficult to say that Pace is merely a department within the RTA that has no separate legal existence. See, *e.g.*, *Gray v. City of Chicago*, 159 F. Supp. 2d 1086, 1089 (N.D. Ill. 2001) (Chicago police department is merely a department of the City of Chicago that does not have a separate legal existence).

The Act contemplates that the service boards operate autono-

mously and that the RTA provide financial oversight. Accordingly, the RTA and Pace have separate governing boards. The Act grants Pace many of the same powers it grants to the RTA (70 ILCS 3615/3A.09 (West 2000)), most notably, the power to sue and be sued; to pass, amend, and repeal bylaws, rules and regulations, and ordinances that are not inconsistent with the Act; to own property; and to enter into contracts. 70 ILCS 3615/2.20(a) (West 2000).

Supporting further the concept that the RTA and Pace are separate legal entities is section 5.03 of the Act, which immunizes the RTA from liability for injuries resulting from the negligence of any transportation agency to which the RTA provided funds or with which it had a purchase of service agreement. 70 ILCS 3615/5.03 (West 2000). In a similar vein, in *Patinkin v. Regional Transportation Authority*, 214 Ill. App. 3d 973 (1991), the court held that the plaintiff failed to comply with a statute requiring those seeking to sue the CTA to serve the CTA's secretary and general counsel with notice of the accident. The plaintiff sent the notice to the RTA's secretary and general counsel. The court found nothing to suggest a relationship between the RTA and the CTA that would allow the notice to the RTA to satisfy the requirement that the plaintiff serve notice on the CTA. Of particular importance to the court was that the RTA and the CTA had separate administrative compositions. *Patinkin*, 214 Ill. App. 3d at 978.

In *Chicago Transit Authority v. Danaher*, 40 Ill. App. 3d 913, 917-18 (1976), the court held that, even though they did not possess the power to tax, the CTA and the Chicago Housing Authority were "special districts" and therefore could take advantage of a statute exempting "units of local government" from paying circuit court filing fees. The court defined a "special district" as a relatively autonomous local government that provides a single service. *Danaher*, 40 Ill. App. 3d at 917. Also, special districts possess structural form, an official name, perpetual succession, and the right to make contracts and dispose of property. *Danaher*, 40 Ill. App. 3d at 917. The *Danaher* court relied on the CTA's autonomy, its designation as a municipal corporation, and its ability to purchase and dispose of land, issue revenue bonds, and solicit and accept federal and state grants. *Danaher*, 40 Ill. App. 3d at 914.

The trial court here went to great lengths to differentiate the CTA from Pace. The CTA was created by the Metropolitan Transit Authority Act (Transit Authority Act) (70 ILCS 3605/1 *et seq.* (West 2000)) and existed before the legislature created the RTA. The Transit Authority Act designates the CTA as a political subdivision, body politic, and municipal corporation (70 ILCS 3605/3 (West 2000)), but

subjects the CTA to the RTA's financial oversight. 70 ILCS 3605/9b (West 2000).

Although the Transit Authority Act and the Act designate the CTA and Pace differently, in substance they are very similar. As the *Danaher* court noted, the term "municipal corporation" originated in statutory texts and has no origin in either the 1870 or 1970 constitution. *Danaher*, 40 Ill. App. 3d at 914 n.2. Also, although the CTA was not under the financial auspices of the RTA at the time *Danaher* was decided, the CTA and Pace today possess a great deal of operating autonomy. Therefore, there is no reason to treat them differently.

The RTA's attempt to portray Pace merely as one of its operating divisions is not convincing. As the above discussion reveals, Pace operates autonomously and has a separate governing board and legal existence. The better analogy is the relationship between parent and subsidiary corporations, which are distinct legal entities. *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 172, 174 (1994); *Flynn v. Allis Chalmers Corp.*, 262 Ill. App. 3d 136, 140 (1994). An action by a parent corporation that injures its subsidiary is actionable as a breach of fiduciary duty. *Centaur Insurance Co.*, 158 Ill. 2d at 174. Although the Act designates Pace as the suburban bus division of the RTA, there is nothing in the Act suggesting that Pace has the ability to sue and be sued by everyone except for the RTA.

### F. Tort Immunity Act

Because we have rejected the legal theories upon which the trial court relied to dismiss the complaint, we must address the remaining issues the RTA raised in its motion to dismiss. The RTA's reliance on the Tort Immunity Act is misplaced. It is well settled that the Tort Immunity Act applies only to tort actions seeking damages and not to actions seeking injunctive relief. *People ex rel. Birkett v. City of Chicago*, 325 Ill. App. 3d 196, 204 (2001). Although the complaint seeks "damages," the monetary award Pace seeks is not for tort damages but in effect back subsidies. See *Romano v. Village of Glenview*, 277 Ill. App. 3d 406, 410 (1995) (Tort Immunity Act did not apply to action seeking injunctive relief even though defendant would be required to expend money to provide the requested relief). Because Pace does not rely on any tort theories of recovery, the Tort Immunity Act does not apply.

### G. Statute of Limitations and *Laches*

As the previous section reveals, the RTA's reliance on the statute of limitations in the Tort Immunity Act is misplaced. The RTA's *laches* argument merits further discussion, however. The *laches* doctrine bars relief where the defendant has been misled or prejudiced

because of the plaintiff's delay in asserting a right. *City of Marengo v. Pollack*, 335 Ill. App. 3d 981, 988 (2002). For *laches* to apply, the plaintiff must have knowledge of its right but fail to assert it timely. *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 270 (2001). Although a mere delay in asserting a right does not trigger *laches*, if the defendant has relied to his detriment on the circumstances complained of and the delay has been unreasonable, then it would be unjust to grant relief to the plaintiff. *City of Marengo*, 335 Ill. App. 3d at 988. Equitable relief may be refused even though the applicable statute of limitations has not expired. *Sundance Homes*, 195 Ill. 2d at 270.

Pace filed its complaint on January 11, 2002, shortly after the 2002 fiscal year started and shortly after the RTA made the challenged budget decisions. Because Pace sued promptly, *laches* does not apply to the 2002 budget decisions.

*Laches* does apply, however, to Pace's request for a monetary award representing subsidies that Pace alleges it should have received in the years 1996 through 2001. When Pace filed its complaint, these budget years had concluded, and, presumably, the funds at issue were no longer available. It would be highly prejudicial to require the RTA to pay these "back subsidies" long after these funds have become a part of the RTA's budget history. Therefore, we conclude that Pace may not recover "back subsidies" for the years 1996 through 2001.

## H. Sufficiency of the Complaint

The RTA argues that the complaint's allegations are not sufficient to state a claim that the RTA acted arbitrarily and capriciously. We disagree. In count I, Pace has alleged increases in its recovery ratios that are significantly greater than the increases assigned to the other service boards and that run counter to expectations based on Pace's operating history. In count II, Pace alleged that the RTA rejected Pace's proposed use of federal grant funds even though federal law expressly authorized such a use. Essentially, Pace has alleged that the RTA has acted outside the discretion the Act grants it. These are factual questions that must be resolved on remand. If, on remand, Pace makes out a *prima facie* case, then the RTA will have the opportunity to justify its decisions.

## I. Failure to Join CTA and METRA

Finally, we feel compelled to address an additional issue even though the parties have not raised it. It is clear that count I should not go forward unless Pace can join the CTA and Metra, which are necessary parties. Although we are reluctant to raise this issue *sua sponte*, it is necessary to do so as a matter of judicial economy because

it is error for the trial court to proceed to a judgment without the involvement of all the parties necessary to the litigation. *Bank of Homewood v. Chapman*, 257 Ill. App. 3d 337, 347 (1993). A necessary party is one whose presence in the suit is required for any one of three reasons: (1) to protect an interest that the absent party has in the subject matter of the controversy that would be materially affected by a judgment entered in his absence; (2) to reach a decision that will protect the interests of those who are before the court; or (3) to enable the court to decide the controversy completely. *In re Marriage of Devick*, 315 Ill. App. 3d 908, 913-14 (2000).

■ In count I, Pace alleges that, in violation of section 4.11(a) of the Act, the RTA "disproportionately and prejudicially" increased Pace's recovery ratio. Pace asks the court to lower its recovery ratio and, in effect, increase its operating subsidies. The RTA and the service boards operate in part on limited subsidies, and the Act requires that the service boards' aggregate operating revenue equal at least 50% of their aggregate cost of providing public transportation each fiscal year. 70 ILCS 3615/4.01(b) (West 2000). Thus, if it were required to lower Pace's recovery ratio, then by law, to compensate, the RTA would have to raise the other service boards' ratios. Accordingly, the CTA and Metra have a direct interest in the outcome of the claim asserted in count I.

During the oral argument, Pace responded that, because the CTA and Metra are so much larger than Pace, any adjustment to Pace's recovery ratio would have a negligible effect on the budgets of the CTA and Metra. For example, the 2002 projected fare box revenues for the CTA, Metra, and Pace were $473 million, $246 million, and $54 million, respectively. Although these differences are significant, we cannot say that they are so great that the CTA and Metra have no interest in the outcome of the controversy.

Accordingly, although we have concluded that count I may have substantive merit, that claim should not go forward unless Pace joins the CTA and Metra as necessary parties. See 735 ILCS 5/2—407 (West 2000) (no action shall be dismissed for failure to join necessary parties without first affording a reasonable opportunity to add them as parties).

## IV. CONCLUSION

We reverse the judgment of the circuit court of McHenry County and remand the cause with the directions that (1) the trial court should not allow count I to go forward unless Pace can join the CTA and Metra, which are necessary parties to this action; and (2) Pace is

not entitled to recover any "back subsidies" for the years 1996 through 2001.

Reversed and remanded with directions.

O'MALLEY and GILLERAN JOHNSON, JJ., concur.